UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division

ABUKAR OSMAN BEYLE,

      Petitioner,

v.                                    CIVIL ACTION NO. 2:16cv603
                                      [ORIGINAL CRIMINAL NO. 2:11cr34-2]

UNITED STATES OF AMERICA,

      Respondent.

## OPINION

This matter comes before the court on the Petitioner's "Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence" ("Motion"), and accompanying memorandum, filed pro se on October 7, 2016.[1] ECF Nos. 982, 983. On November 22, 2016, the court ordered the United States to respond to the Petitioner's Motion. ECF No. 985. The United States filed its Response on March 24, 2017. ECF No. 1004. After receiving an extension, the Petitioner filed his Reply on May 8, 2017.[2] ECF No. 1012. The matter is now ripe for review.

---

[1] The court accepts the Petitioner's Motion and memorandum as effectively filed on the date the Petitioner certifies he placed them in the prison's internal mailing system, which is September 30, 2016. See Houston v. Lack, 487 U.S. 266 (1988) (articulating the prison mailbox rule).

[2] The court accepts the Petitioner's Reply as effectively filed on May 1, 2017. See supra note 1.

In early February 2011, a group of nineteen pirates left Somalia prepared to hijack a ship at sea. They were aboard a captured Yemeni boat, operated by four Yemeni hostages, and were armed with automatic firearms and a rocket-propelled grenade launcher. The Petitioner was among this group; he provided a motor to operate the small boat that would be used to launch fast-moving attacks on target ships. A list was drawn up naming each of the nineteen pirates involved in the mission so that it would be known how the proceeds would be divided among them. The Petitioner's name was on this list.

On February 18, 2011, the pirates spotted the Quest, a sailboat flying a United States flag. The Quest was owned by Scott and Jean Adam. The Adams and their friends, Robert Riggle and Phyllis Macay, all United States citizens, were traveling from India to Oman. On the day the Quest was targeted, the pirates had been at sea about nine days and had traveled over nine hundred miles. Six pirates quickly jumped into the small boat, armed with firearms and the rocked-propelled grenade launcher, and headed towards the Quest. The Petitioner was among this group. As they approached, the Petitioner fired his AK-47 into the air.

Once on board, the pirates took the Americans hostage, cut the communications line on the ship and moved their supplies

from the Yemeni boat to the Quest. The pirates then released their four Yemeni captives, allowing them to sail off in the Yemeni boat. The pirates, setting a course for Somalia, took stock of the Quest. Including the Petitioner, many of them put on clothing belonging to the four American hostages. The pirates used the Americans' cellphones to take photographs and videos of each other wearing the Americans' clothing, holding guns, smiling, and so forth. Meanwhile, the hostages were kept under armed guard in the horseshoe-shaped bench area around the helm of the Quest. The Petitioner was one of the pirates assigned guard duty.

Before the pirates could travel much farther, however, they were intercepted by the United States Navy. On establishing radio communication with the pirates, the Navy explained to the pirates that they would not be allowed to reach Somalia's territorial waters with the hostages and that any negotiation for the hostages' release would need to occur in international waters. The pirates resisted, and some of them threated to kill the hostages if they were not allowed to reach Somalia. The Petitioner was a member of this group.

On February 22, 2011, when the Quest was about thirty to forty nautical miles from Somalia's coast, the Navy began maneuvering to block the Quest's course to Somalia. More threats were made against the hostages' lives, and one pirate fired a

3

rocket-propelled grenade at one of the Navy ships. Shortly thereafter, the Petitioner and two of his fellow pirates, Ahmed Muse Salad ("Salad") and Shani Nurani Shiekh Abrar ("Abrar"), shot and killed the four hostages. The Navy immediately headed for the Quest, and boarded and secured it. During this encounter, some of the pirates were killed; the remainder were captured.

While en route to the United States, the pirates were given Miranda warnings and interviewed by the Federal Bureau of Investigation ("FBI"). After arrival in the United States, the pirates were arrested and a grand jury returned a three-count indictment against them. Eleven pled guilty. The Petitioner, Salad, and Abrar, who had all not pled guilty, were then charged in a superseding indictment with twenty-six criminal counts:

- Count One: Conspiracy to Commit Hostage Taking Resulting in Death, in violation of 18 U.S.C. §§ 1203(a), 3238, and 2.

- Counts Two through Five: Hostage Taking Resuling in Death, in violation of 18 U.S.C. §§ 1203(a), 3238, and 2.

- Count Six: Conspiracy to Commit Kidnapping, in violation of 18 U.S.C. §§ 1201(c) and 3238.

- Counts Seven through Ten: Kidnapping Resulting in Death, in violation of 18 U.S.C. §§ 1201(a)(2), 3238, and 2.

- Count Eleven: Conspiracy to Commit Violence Against Maritime Navigation Resulting in Death, in violation of 18 U.S.C. §§ 2280(a)(1)(H), 2280(b)(1), and 3238.

- Counts _Twelve_ _through_ _Fifteen_: Violence Against Maritime Navigation Resulting in Death, in violation of 18 U.S.C. §§ 2280(a)(1)(G), 2280(b)(1), 3238, and 2.

- Counts _Sixteen_ _through_ _Nineteen_: Murder Within the Special Maritime and Territorial Jurisdiction of the United States, in violation of 18 U.S.C. §§ 1111, 3238, and 2.

- Count _Twenty_: Piracy Under the Law of Nations, in violation of 18 U.S.C. §§ 1651, 3238, and 2.

- Count _Twenty-One_: Use, Carry, and Brandish a Firearm During a Crime of Violence, in violation of 18 U.S.C. §§ 924(c)(1)(A)(ii) and (B)(ii), 3238, and 2.

- Counts _Twenty-Two_ _through_ _Twenty-Five_: Use, Carry, and Discharge of a Firearm During a Crime of Violence Causing Death, in violation of 18 U.S.C. §§ 924(c)(1)(A)(iii) and (B)(ii), 924(j), 3238, and 2.

- Count _Twenty-Six:_ Use, Carry, and Discharge of a Firearm During a Crime of Violence, in violation of 18 U.S.C. §§ 924(c)(1)(A)(iii) and (B)(ii), 3238, and 2.

See Superseding Indictment, ECF No. 237.

On July 8, 2013, after a month-long trial, the jury returned a verdict finding the Petitioner, Abrar, and Salad guilty of all twenty-six counts. ECF No. 751. On November 14, 2013, the court sentenced the Petitioner to a term of life, plus eighteen consecutive life terms, and thirty consecutive years. Judgment, ECF No. 889.[3] The court also imposed consecutive life sentences on Counts Seven through Ten; however,

---

[3] For reasons detailed on the record, and not at issue here, the Petitioner waived a sentence to a term of years less than life as to any counts for which such a sentence was available. See Notice of Intent to Waive a Sentence of a Term of Years Less than Life, ECF No. 830; Trial Tr. 4358:22-4368:5, ECF No. 933.

pursuant to the court's Memorandum Order of November 27, 2012, it vacated as duplicative those convictions and sentences. Id.; see United States v. Salad, 907 F. Supp. 2d 743, 750 (E.D. Va. 2012) (denying as premature the "Defendants' Joint Motion to Dismiss Counts 7, 8, 9, and 10," but agreeing that, should the defendant(s) be found guilty of these and Counts Two through Five, these convictions would "impermissibly overlap" in violation of the Double Jeopardy Clause).

On appeal, the Petitioner challenged his convictions on the sole basis "that the district court lacked jurisdiction over the charges of murder (Counts 16, 17, 18, and 19) and concomitant use of a firearm (Counts 22, 23, 24, and 25) because the underlying actions occurred within Somalia's territorial waters, not on the high seas." United States v. Beyle, 782 F.3d 159, 165 (4th Cir. 2015).[4] On April 3, 2015, the United States Court of Appeals for the Fourth Circuit determined that "the site of the murders, thirty to forty nautical miles from the Somali coast, lay on the high seas and thus beyond the territorial sea of any nation," id. at 162, and affirmed this court's judgment. Id. The

---

[4] Abrar also appealed his convictions, albeit on separate grounds. The Petitioner and Abrar's appeals were consolidated and the Fourth Circuit's opinion also addresses Abrar's arguments. Coincidentally, Abrar claimed then, like the Petitioner does now, that "he was kidnapped before the piracy operation" and "he was unable to present certain witnesses who could have corroborated his duress defense." Beyle, 782 F.3d at 161. The Fourth Circuit rejected Abrar's challenge. Id. at 172-73.

Petitioner filed a petition for a writ of certiorari with the United States Supreme Court on July 1, 2015, and it was denied on October 5, 2015. Beyle v. United States, 136 S. Ct. 179 (2015) (mem.). The Petitioner subsequently filed the instant Motion.

## II.

A prisoner may challenge a sentence imposed by a federal court, if (1) the sentence violates the Constitution or laws of the United States; (2) the sentencing court lacked jurisdiction to impose the sentence; (3) the sentence exceeds the statutory maximum; or (4) the sentence "is otherwise subject to collateral attack." 28 U.S.C. § 2255(a). A sentence is "otherwise subject to collateral attack," if a petitioner shows that the proceedings suffered from "a fundamental defect which inherently results in a complete miscarriage of justice." United States v. Addonizio, 442 U.S. 178, 185 (1979) (quoting Hill v. United States, 368 U.S. 424, 428 (1962) (internal quotation marks omitted)). A petitioner bears the burden of proving one of those grounds by a preponderance of the evidence. See Miller v. United States, 261 F.2d 546, 547 (4th Cir. 1958). If he satisfies that burden, the court may vacate, set aside, or correct the sentence. 28 U.S.C. § 2255(b). However, if the motion, when viewed against the record, shows that the petitioner is entitled

to no relief, the court may summarily deny the motion. Raines v. United States, 423 F.2d 526, 529 (4th Cir. 1970).

Furthermore, "once a defendant has waived or exhausted his appeals, the court is 'entitled to presume he stands fairly and finally convicted.'" Michel v. United States, 849 F. Supp. 2d 649, 653 (W.D. Va. 2012) (quoting United States v. Frady, 456 U.S. 152, 164 (1982)). Therefore, under the doctrine of procedural default, claims asserting trial errors—of fact or law—

> that could have been, but were not raised on direct appeal are barred from review under § 2255, unless the defendant shows [(1)] cause for the default and actual prejudice resulting from such errors or [(2)] demonstrates that a miscarriage of justice would result from the refusal of the court to entertain the collateral attack.

United States v. Shelton, No. 1:04cr45, 2009 WL 90119, at *1 (W.D. Va. Jan. 14, 2009) (emphasis added) (citing United States v. Mikalajunas, 186 F.3d 490, 492-93 (4th Cir. 1999)); Frady, 456 U.S. at 167-68.

If a petitioner alleges cause and prejudice to overcome the procedural default bar, both must be present, and the absence of either is sufficient to deny the petitioner relief. See Frady, 456 U.S. at 168 ("[W]e find it unnecessary to determine whether [the petitioner] has shown cause, because we are confident he suffered no actual prejudice . . . ."). Cause "must turn on something external to the defense, such as the novelty of the

claim or a denial of effective assistance of counsel."
Mikalajunas, 186 F.3d at 493. Prejudice cannot be "merely that
the errors at [the] trial created a possibility of prejudice,
but that they worked to [the petitioner's] actual and
substantial disadvantage, infecting his entire trial with error
of constitutional dimensions." Frady, 456 U.S. at 170. If
alleging "a miscarriage of justice would result from the refusal
of the court to entertain the collateral attack, a movant must
show actual innocence by clear and convincing evidence."
Mikalajunas, 186 F.3d at 493. "To establish actual innocence,
[the] petitioner must demonstrate that 'in light of all the
evidence,' 'it is more likely than not that no reasonable juror
would have convicted him.'" Bousley v. United States, 523 U.S.
614, 623 (1998) (quoting Schlup v. Delo, 513 U.S. 298, 327-28
(1995)).

Importantly, the procedural default bar does not apply to
claims of ineffective assistance of counsel, which are properly
asserted for the first time in a § 2255 motion. See United
States v. King, 119 F.3d 290, 295 (4th Cir. 1997). Whether
asserting ineffective assistance of counsel as cause for
excusing procedural default or as independent grounds for
relief, a petitioner must show, by a preponderance of the
evidence, that (1) "counsel's performance was deficient," and
(2) "the deficient performance prejudiced the defense."

9

Strickland v. Washington, 466 U.S. 668, 687, 694 (1984); see Murray v. Carrier, 477 U.S. 478, 488 (1986) (stating the Strickland standard applies when a petitioner alleges ineffective assistance of counsel as cause excusing a procedural default). The Petitioner must "satisfy both prongs, and a failure of proof on either prong ends the matter." United States v. Roane, 378 F.3d 382, 404 (4th Cir. 2004). "'[U]nsubstantiated and largely conclusory statements' are insufficient to carry a petitioner's burden as to the two prongs of this test . . . ." Umar v. United States, 161 F. Supp. 3d 366, 375 (E.D. Va. 2015) (quoting United States v. Turcotte, 405 F.3d 515, 537 (7th Cir. 2005) (alteration in original)).

A petitioner satisfies the deficient performance prong when he shows that counsel's conduct "fell below an objective standard of reasonableness . . . under prevailing professional norms." Strickland, 466 U.S. at 687-88. However, "[j]udicial scrutiny of counsel's performance must be highly deferential" because "[i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." Id. at 689. "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that

10

counsel's conduct falls within the wide range of reasonable professional assistance . . . ." Id. To demonstrate prejudice, a petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. In doing so, a petitioner "must demonstrate that the error worked to his 'actual and substantial disadvantage,' not merely that the error created a 'possibility of prejudice.'" Satcher v. Pruett, 126 F.3d 561, 572 (4th Cir. 1997) (quoting Murray, 477 U.S. at 494).

Due process of law also requires that a defendant receive effective assistance of counsel on direct appeal. Evitts v. Lucey, 469 U.S. 387, 396-97 (1985). As with trial counsel, effectiveness of appellate counsel is evaluated under the two prongs of Strickland. Smith v. Robbins, 528 U.S. 259, 285 (2000). To determine effectiveness of appellate counsel, a court must evaluate whether counsel failed to raise "a particular nonfrivolous issue [that] was clearly stronger than issues that counsel did present" on direct appeal. Smith, 528 U.S. at 288. However, appellate counsel "need not (and should not) raise every nonfrivolous issue." Id.; Jones v. Barnes, 463 U.S. 745, 752-53 (1983) ("A brief that raises every colorable issue runs the risk of burying good arguments."). Accordingly, although "it is still possible to bring a Strickland claim based on counsel's failure to raise a particular claim, . . . it is difficult to

11

demonstrate that counsel was incompetent." Smith, 528 U.S. at 288. As to prejudice, a petitioner must show a reasonable probability that, but for counsel's unprofessional errors, his appeal would have been successful. See id. at 285-86, 288.

### III.

This Motion is the Petitioner's first under 28 U.S.C. § 2255, and it is timely.[5] The Motion raises nine[6] grounds for relief: (1) the Petitioner's Fifth and Sixth Amendment rights were violated when an interpreter deliberately mistranslated and/or refused to translate statements by the Petitioner to his trial attorneys and to the court, Mem. Supp. at 8, 22; Reply at 8; (2) the Petitioner's trial attorneys were ineffective for their failure to identify and correct the alleged interpreter problem, Mem. Supp. at 13, 24; Reply at 37; (3) the Petitioner's Fifth Amendment rights were violated when he was convicted of

---

[5] The Petitioner's conviction became final on October 5, 2015, when his petition for writ of certiorari was denied by the United States Supreme Court. Beyle, 136 S. Ct. 179; see Clay v. United States, 537 U.S. 522, 527 (2003) ("Finality attaches when th[e] [Supreme] Court affirms a conviction on the merits on direct review or denies a petition for a writ of certiorari, or when the time for filing a certiorari petition expires."). Thus, under 28 U.S.C. § 2255(f)(1), the Petitioner had until October 5, 2016 to file a § 2255 motion, and he filed it on September 30, 2016. See supra note 1.

[6] For clarity, additional ineffective assistance arguments made in the portion of the Petitioner's supporting memorandum labeled Ground Two are addressed as separate grounds, Grounds Eight and Nine.

12

multiplicitous counts in violation of the Double Jeopardy Clause, Mem. Supp. at 31; (4) the Petitioner's convictions for multiple conspiracy charges violate his Fifth and Sixth Amendment rights, id. at 48; (5) the Petitioner's Fifth and Sixth Amendment rights were violated by the trial court's refusal to let him call a witness, id. at 58, 59; (6) the Petitioner's Fifth and Sixth Amendment rights were violated by the court's "systematic[] exclu[sion]" of Somali citizens and Muslims from the jury pool, id. at 65; (7) there was insufficient jurisdiction and/or evidence to convict the Petitioner of the firearms charges, id. at 69, 72, 75; Reply at 72-73; (8) the Petitioner's trial attorneys were ineffective for operating under a conflict of interest, Mem. Supp. at 19; and (9) the Petitioner's trial attorneys were ineffective for failing to assert a duress defense, id. at 24. The Petitioner also requests an evidentiary hearing, id. at 22, 30; discovery, id. at 30; and appointments of counsel and an interpreter to assist him in this habeas proceeding, id. at 75.

## A. Grounds One and Two

Ground One presents a challenge based on the Fifth Amendment's Due Process Clause and the Sixth Amendment's Confrontation Clause. Id. at 8, 22. The government asserts that Ground One is procedurally defaulted, and it is. Resp. at 13. As cause excusing this default, the Petitioner alleges ineffective

assistance of counsel. Mot. at 10; Mem. Supp. at 22. The Petitioner's argument for ineffective assistance as cause is the same as his argument for his freestanding ineffective assistance claim raised as Ground Two: The Petitioner's trial attorneys were ineffective for failing to recognize and correct the alleged interpreter problem; had his attorneys fixed the interpreter problem, the Petitioner alleges he would have been able to assist in his defense—specifically, by explaining to his attorneys facts allegedly supporting a duress defense. See Mem. Supp. at 14-16, 18, 22, 24; Reply at 7-8, 37. Because both Grounds One and Two rely on this alleged interpreter problem, the court addresses them together.

The alleged interpreter problem is summarized as follows: The interpreter provided to the Petitioner to assist him in his preparation of his defense, Hassan E. Ali ("Ali"), deliberately mistranslated and/or refused to translate his statements to his trial attorneys and to the court, and even threatened the life of the Petitioner. Mem. Supp. at 12, 15; Reply at 8. Specifically, the Petitioner asserts that Ali refused to translate the Petitioner's statements that would have supported a duress defense at trial. Mem. Supp. at 14-15, 24; Reply at 8. He also alleges that Ali did this by reason of belonging to the same clan as that of the majority of the other pirates, but

which was a different Somali clan than that of the Petitioner. Mem. Supp. at 12; Reply at 14.

The Petitioner has not made the requisite showing under Strickland, as his trial attorneys' failure to recognize and correct the alleged interpreter problem was neither deficient nor prejudicial. A petitioner alleging interpreter inadequacies must make more than conclusory allegations to satisfy the Strickland test. Umar, 161 F. Supp. 3d at 375; see id. at 385-87 (finding mere conclusory allegations of inability to understand interpreters due to difference in dialect insufficient to make a showing of prejudice under Strickland). Additionally, "court interpreters are entitled to a presumption that they execute their official duties with propriety, accuracy, and integrity." Michel, 849 F. Supp. 2d at 657. A petitioner "must adduce specific evidence" to rebut this presumption. Id.

Here, Ali, a court-appointed interpreter, is entitled to the presumption of propriety, accuracy, and integrity. See id. However, the Petitioner has offered only general and contradictory allegations about Ali's performance as an interpreter:

- "[T]he Language qualifications were to be desired, a simple yes or no answer[] was turned into another answer, [the Petitioner] was unable to understand what the answer was, but was sure it was longer than intended." Mem. Supp. at 16.

15

- "When [the Petitioner] began the translation of the incident, his interpreter[] began misinterpretation of what [the Petitioner] was saying. When he was then 'threatened,' that if he did not plea, he would be killed by the 'Majeerteen Family,' and that the Interpreter . . . was also from the 'Majeerteen Family.' Id. at 12.

- "[T]he Interpreter refused to properly translate to [the Petitioner's] Counsel, and also to the Court that the facts were incorrect and being made up by the Interpreter." Id. at 15.

- "The statements for the simple answers were longer than necessary, and the Interpreter was not translating the information to either Counsel or the Court." Id. at 18.

- "The interpreter's qualification and language skills were of a person who was aware of the Somali[] language, and further fluent in the language of America." Id. at 21.

- "The Interpreter's actions, and translation . . . subsequent to the conversation were consistent to the statements that were translated." Reply at 13.

These allegations do not qualify as the sort of "specific evidence" necessary to overcome the presumption in favor of court interpreters. See Michel, 849 F. Supp. 2d at 657-58 & n.10; see also Umar, 161 F. Supp. 3d at 375, 385-87.[7]

Moreover, the Petitioner has failed to demonstrate that his trial attorneys were aware of any interpreter problem and refused to act. The court appointed two other interpreters, Ayderus Ali and Abdulaziz Hussen, to provide simultaneous translation of court proceedings and witness testimony for the

---

[7] For example, no specific references to any document or trial translation has been made, and all documents and evidence considered by the court and the jury are of record.

Petitioner and his co-defendants during trial. See, e.g., Trial

Tr. 892:19-893:18, ECF No. 913 (discussing these interpreters'

responsibilities during trial).[8] These same two interpreters also

provided translation services during pre-trial hearings, as well

as sentencings. See, e.g., ECF Nos. 462, 887. Thus, even if the

Petitioner had any translating or other difficulty with Ali, the

Petitioner still had at least two other court-appointed

interpreters available to him through whom he could not only

understand in-court proceedings, but also bring the alleged

problems with Ali to his attorneys' or the court's attention.[9]

---

[8] Due to the lengthy nature of the trial, these interpreters
alternated translating responsibility for the defendants during
the trial, allowing one to take a break while the other
translated. See, e.g., Trial Tr. 893:4-9. Additionally, whenever
a witness needed interpreter services, the party calling the
witness provided another interpreter. See, e.g., id.
890:12-891:15; id. 2702:22-2703:24, ECF No. 922. The interpreter
for the witness was responsible for translating all questions,
directions, and other comments from counsel and the court to the
witness and for translating the witness's responses.
Specifically, Ahmed M. Ahmed was an interpreter, certified and
sworn, id. 891:5-24, who translated questions and comments from
counsel and the court into Somali or Arabic for witnesses called
by the government, and who translated the witnesses' responses
back into English. Jamal Adam was an interpreter, certified and
sworn, id. 2702:22-2703:24, who translated questions and
comments from counsel and the court into Somali for a witness
called by Abrar's counsel, and who translated the witness's
responses back into English.

[9] The Petitioner states that "it was not long when [he]
discovered . . . his interpreter[] was from another tribe in
Somali[a]," and "[w]hen [the Petitioner] began the translation
of the incident, his interpreter[] began misinterpretation of
what [the Petitioner] was saying." Mem. Supp. at 12. As these
proceedings began on March 8, 2011, and sentencing was not

17

The Petitioner does not contend that he told these other interpreters of his alleged problems with Ali, nor has he pointed to anything in the record indicating that he even made such an attempt to tell them; in fact, he implicitly admits he did not make any such attempt. See Reply at 9 (questioning now whether anyone explained to him that he could have raised the interpreter problem through the other interpreters).

Although the Petitioner asserts, for the first time in his Reply, that he "warn[ed]" his counsel "of this issue," id. at 12, he points to nothing in the record evidencing such a warning. Additionally, the Petitioner's new multiple assertions, in his Reply, of his inability to communicate with his attorneys due to their lack of fluency in Somali and his own lack of proficiency in English undermine this claim. See, e.g., id. at 9 ("How is the Lead Counsel to know unless he is fluent in Somali??"). Thus, to the extent the Petitioner did not inform his attorneys of the alleged interpreter problem, it seems the Petitioner simply expected the court and counsel to read his

---

complete until November 14, 2013, the Petitioner had well over two years and numerous appearances in court to raise the matter. His failure to even attempt to inform the court of any problems with an interpreter's services, despite multiple interpreters being available to him at various times, calls into question whether any such problems even existed. See Umar, 161 F. Supp. 3d at 386 (determining a § 2255 petitioner's failure to raise interpreter issues at "pre-trial hearings, trial, or sentencing" undermined his ineffective assistance claim based on same on collateral attack).

mind. The Constitution does not require this. See Valladares v. United States, 871 F.2d 1564, 1566 (11th Cir. 1989) (Retired Justice Lewis F. Powell, Jr., sitting by designation) (holding district court did not abuse its discretion in denying a § 2255 petition alleging interpreter inadequacy because "[t]o allow a defendant to remain silent throughout the trial and then, upon being found guilty, to assert a claim of inadequate translation would be an open invitation to abuse"). Accordingly, the Petitioner's trial attorneys' alleged failure to recognize and correct the alleged interpreter problem was not deficient conduct.

Moreover, the Petitioner cannot demonstrate prejudice here, as the record contradicts the Petitioner's assertions that Ali prevented the Petitioner from communicating effectively with his counsel about facts allegedly supporting a duress defense. For example, defense testimony about the Petitioner's family, upbringing, education, and other history indicates that the Petitioner was able to successfully communicate information about his background and family in Somalia to his defense team, such that members of the defense team were able to visit Somalia and make contact with the Petitioner's family, friends, neighbors, and his Quran teacher. Trial Tr. 4199-4216, ECF No. 931. In fact, the Petitioner was even able to provide phone numbers for his wife and other family members during interviews

between the Petitioner and the defense team, id. 4212:24-4213:2, and it was Ali who provided interpreter services during these interviews. Id. 4203:8-18.[10]

Finally, many of the factual allegations raised by the Petitioner in support of his duress defense were statements he initially made to the FBI during the initial interviews conducted while en route to the United States. These include the Petitioner's allegation that (1) he was employed as a fisherman before joining the pirates, (2) he worked as a cook for the pirates, (3) he was in the kitchen right before the shooting started, (4) he was bringing coffee to one of the hostages just prior to the shooting, and (5) he treated the hostages well. Compare Mem. Supp. at 27-28, and Reply at 30, 78, with Ex. 1, ECF No. 1004-1 [hereinafter "FBI Interview Summaries"]. The FBI interviews were recounted during trial in great detail, see Trial Tr. 1698:17-1721:7, ECF No. 917, and the Petitioner's counsel cross-examined the testifying agent on them. Id. 1732:14-1738:24. Evidently, then, not only did the Petitioner's

_____

[10] Additionally, Ali also interpreted between the defense team and the Petitioner's family during phone interviews with the Petitioner's family. Trial Tr. 4201:8-16; id. 4214:2-5. These phone interviews began in December of 2011, id. 4202:13-14, and other members of the defense team, including an investigator who spoke both Somali and English, followed up on the phone interviews with in-person visits to Somalia as well as with video-conferencing. Id. 4162:6-4163:12. In fact, the evidence supports that Ali's interpretive services advanced the Petitioner's case, not hindered or undermined it.

trial attorneys have access to many of the facts the Petitioner now claims support his duress defense, his attorneys also did not need Ali to communicate these facts. See FBI Interview Summaries. For these reasons, the Petitioner's trial attorneys' conduct was not prejudicial to the Petitioner.

Because the Petitioner fails to satisfy both prongs of the Strickland test, he has not established cause excusing his procedural default as to Ground One or the merits of Ground Two. Accordingly, Ground One is **DISMISSED** as procedurally defaulted and Ground Two is **DENIED** on the merits. Additionally, regardless of default, Ground One is without merit. The Petitioner's allegations in support of his claim are conclusory at best; his failure to even attempt to raise any interpreter problem with the other court-appointed interpreters over the two years preceding trial, during the month-long trial, and at sentencing, significantly undermines the claim; and, ultimately, the record plainly contradicts the existence of any alleged interpreter problem with Ali.

## B. Ground Three

### 1.

As Ground Three, the Petitioner argues that his convictions for Hostage Taking Resulting in Death (Counts Two through Five) (the "Hostage Taking counts"); Kidnapping Resulting in Death (Counts Seven through Ten) (the "Kidnapping counts"); Violence

21

Against Maritime Navigation Resulting in Death (Counts Twelve through Fifteen) (the "Violence counts"); Murder Within the Special Maritime and Territorial Jurisdiction of the United States (Counts Sixteen through Nineteen) (the "Murder counts"); and Piracy Under the Law of Nations (Count Twenty) (the "Piracy count") are multiplicitous for various reasons. Mem. Supp. at 31, 34-36, 44-46; Reply at 38-40, 43. The government did not raise procedural default as an affirmative defense to the Petitioner's Ground Three, stating simply that the Hostage Taking/Kidnapping multiplicity challenge was addressed on the merits before trial when the court ruled that kidnapping under 18 U.S.C. § 1201 was a lesser included offense of hostage taking under 18 U.S.C. § 1203; should the Petitioner be convicted of both the Kidnapping and Hostage Taking counts, he could move to dismiss the former following trial. Resp. at 17-18; see Salad, 907 F. Supp. 2d at 750.[11] The court agrees, and indeed, following the Petitioner's convictions on both sets of counts, pursuant to this pre-trial ruling, the court vacated the Petitioner's convictions and sentences on the Kidnapping counts. See Judgment at 3 (vacating the Kidnapping convictions and sentences). The

---

[11] Because the United States did not raise procedural default, which is "an affirmative defense that must be pled by the government," the court addresses Ground Three on the merits. United States v. Runyon, 228 F. Supp. 3d 569, 639-642 & n.54 (E.D. Va. 2017) (addressing petitioner's argument for selective prosecution on merits where government failed to raise procedural default due to confusion from related claim).

Petitioner concedes this fact. Reply at 40, 44 (acknowledging his convictions on the Kidnapping counts were vacated at sentencing because kidnapping under 18 U.S.C. § 1201 is a lesser included offense of hostage taking under 18 U.S.C. § 1203). The court reaffirms its previous decision on the merits here, and reiterates its reasoning herein. See Salad, 907 F. Supp. 2d at 750 (determining that the Kidnapping and Hostage Taking statutes were multiplicitous for Double Jeopardy purposes).

The Petitioner also appears to argue that the Double Jeopardy Clause requires vacation of the convictions and sentences for the Hostage Taking counts, not just the Kidnapping counts, as well as the related conspiracy counts (Counts One and Six). Mem. Supp. at 36; Reply at 40. This is incorrect. The Double Jeopardy Clause "provides protection against the imposition of cumulative punishments for the same offense in a single criminal trial." United States v. Ragins, 840 F.2d 1184, 1187 (4th Cir. 1988) (emphasis added). In this case, it required the vacation of either the Hostage Taking counts or the Kidnapping counts, as convictions for both would have been cumulative. Once the Kidnapping counts were vacated, the Double Jeopardy Clause requirements were satisfied. Further, "a conspiracy to commit an offense and the substantive offense underlying the conspiracy are distinct crimes which do not merge

into a single punishable act." United States v. Walker, 796 F.2d 43, 46 (4th Cir. 1986).

The Petitioner next argues that the Violence, Murder, and Piracy counts charge the same offense. Mem. Supp. at 37-45; Reply at 39, 43. To determine whether Congress intends to impose multiple punishments when a single course of conduct violates multiple statutes, courts must first look to the statutory text. United States v. Martin, 523 F.3d 281, 290 (4th Cir. 2008). If the statutory text does not provide a definitive indication of Congress's intent, the court must apply the test set out in Blockburger v. United States, 284 U.S. 299 (1932), which requires determining whether "each provision requires proof of an additional fact which the other does not." Id. at 304. In this case, the text of the three statutes does not indicate a clear congressional intent to allow or disallow multiple punishments. See 18 U.S.C. §§ 1111, 1651, 2280. Accordingly, the court applies the Blockburger test. See United States v. Ayala, 601 F.3d 256, 264-65 (4th Cir. 2010), cert. denied, 131 S. Ct. 262 (2010) (setting out the framework for utilizing the Blockburger test).

Here, it is evident that each of the three statutes, 18 U.S.C. § 2280 (the "Violence statute"); 18 U.S.C. § 1111 (the "Murder statute"); and 18 U.S.C. § 1651 (the "Piracy statute"), requires proof of facts which the other two do not.

Specifically, the Violence statute, as charged, requires proof that the Petitioner "seize[d] or exercise[d] control over a ship by force or threat thereof or any other form of intimidation." 18 U.S.C. § 2280(a)(1)(A); see Superseding Indictment at 16-19. By contrast, the Murder statute has no such element, and, as charged, requires proof that the victim was killed during "the perpetration of, or attempt to perpetrate, any . . . kidnapping . . . or robbery." 18 U.S.C. § 1111; see Superseding Indictment at 20-23. This same element of the Murder statute distinguishes it from the Piracy statute, which requires proof of "piracy as defined by the law of nations." 18 U.S.C. § 1651; see Superseding Indictment at 24.

Comparing the Violence statute and the Piracy statute,[12] the former, as charged, requires proof that a person was "injure[d] or kill[ed]" in connection with the seizure or exercising control over a ship by force and threat or intimidation. 18 U.S.C. § 2280(a)(1)(G); see Superseding Indictment at 16-19. The Piracy statute has no such requirement. Additionally, the Piracy statute requires proof of "piracy as defined by the law of nations." 18 U.S.C. § 1651. The United States Court of Appeals

---

[12] The court notes that the Petitioner's trial counsel made a motion to dismiss the Piracy count on the basis that the Piracy statute was a lesser included offense of the Violence statute, Trial Tr. 2668:15-2669:11, ECF No. 921, to which the government objected, id. 2670:6-2671:6. The court denied the motion. Id. 2673:1-9.

25

for the Fourth Circuit has held that, at the time of the _Quest_ hijacking, the law of nations defined piracy as consisting of:

> (a) any illegal acts of violence or detention, or any act of depredation, committed for private ends by the crew or the passengers of a private ship or a private aircraft, and directed:
>
> > (i) on the high seas, against another ship or aircraft, or against persons or property on board such ship or aircraft;
> >
> > (ii) against a ship, aircraft, persons or property in a place outside the jurisdiction of any State;
>
> (b) any act of voluntary participation in the operation of a ship or of an aircraft with knowledge of facts making it a pirate ship or aircraft;
>
> (c) any act of inciting or of intentionally facilitating an act described in subparagraph (a) or (b).

United States v. Shibin, 722 F.3d 233, 240 (4th Cir. 2013) (emphasis omitted) (quoting United Nations Convention on the Law of the Sea art. 101, Dec. 10, 1982, 1833 U.N.T.S. 397, 436);[13] see United States v. Dire, 680 F.3d 446, 451-59, 469 (4th Cir. 2012) (also adopting this definition of piracy under the law of nations and affirming United States v. Hasan, 747 F. Supp. 2d 599 (E.D. Va. 2010) (Davis, J.), and overturning United States v. Said, 757 F. Supp. 2d 554 (E.D. Va. 2010 (Jackson, J.)).

---

[13] Mohammad Saaili Shibin was identified by the _Quest_ pirates as their negotiator, and this alleged role formed the basis, in part, of the charges brought against him. See Shibin, 722 F.3d at 236-38. He was charged separately from the _Quest_ pirates. See Case No. 2:11cr33.

Accordingly, piracy requires proof of an additional fact that the Violence statute does not. The first sub-definition requires proof that the relevant acts were "committed for private ends." See Dire, 680 F.3d at 465. The second sub-definition requires proof of "any act of voluntary participation in the operation of a pirate ship." See id. Finally, the third sub-definition, which essentially provides for liability for aiding and abetting, see Shibin, 722 F.3d at 241, requires proof that someone (but not necessarily the Petitioner) committed an act that met the criteria of the first sub-definition or the second. See Dire, 680 F.3d at 465; United States v. Ali, 718 F.3d 929, 941 (D.C. Cir. 2013) (stating that to prosecute the defendant for aiding and abetting piracy under 18 U.S.C. §§ 1651 and 2, "the government must prove someone committed piratical acts while on the high seas").

Because all three sub-definitions of piracy require proof of additional facts that are not required by the Violence statute, the Piracy and Violence statutes do not punish the same conduct, and it is presumed that Congress authorized multiple punishments. The burden now shifts to the Petitioner to make a clear showing of contrary legislative intent. See Ayala, 601 F.3d at 265. The Petitioner has not met this burden. The court **DENIES** Ground Three as it is without merit.

The Petitioner also advances two ineffective assistance claims related to Ground Three. First, he argues that, after the guilty verdict, his trial counsel should have moved for the vacation of the Hostage Taking, Kidnapping, and related conspiracy convictions, and was ineffective for failing to do so. Mem. Supp. at 35-36. However, the Kidnapping convictions <u>were</u> vacated at sentencing, in accord with the court's Memorandum Order of November 27, 2012.[14] Additionally, any failure by the trial counsel to move for the vacation of the other convictions was not deficient or prejudicial given that such motion would have been denied.[15] This claim of ineffective assistance of counsel is **DENIED**.

The Petitioner's second ineffective assistance claim is that his appellate counsel was ineffective for not raising Ground Three on appeal. Mem. Supp. at 47; Reply at 40. Given this court's conclusion that Ground Three is without merit, the Petitioner cannot demonstrate a reasonable probability that, but for appellate counsel's failure to raise Ground Three, he would

---

[14] See <u>supra</u> Part III.B.1 (addressing the Petitioner's argument for vacation of the Kidnapping convictions).

[15] See <u>supra</u> Part III.B.1 (addressing the Petitioner's arguments for vacation of the other convictions and denying them on the merits).

have won his appeal. This claim of ineffective assistance of appellate counsel is **DENIED**.

## C. Ground Four

As Ground Four, the Petitioner claims the trial court erred when the Petitioner was convicted of multiple conspiracy charges,[16] in violation of his Fifth and Sixth Amendment rights. Mem. Supp. at 48. The Petitioner primarily advances a sufficiency of the evidence claim,[17] charging that he did not

---

[16] The Petitioner was charged and convicted of three conspiracies: Conspiracy to Commit Hostage Taking Resulting in Death, in violation of 18 U.S.C. § 1203(a) ("Hostage Taking Conspiracy"); Conspiracy to Commit Kidnapping, in violation of 18 U.S.C. § 1201(c) ("Kidnapping Conspiracy"); and Conspiracy to Commit Violence Against Maritime Navigation Resulting in Death, in violation of 18 U.S.C. § 2280(a)(1)(H) ("Violence Conspiracy").

[17] The Petitioner appears to be attempting to use his Reply to add a new claim that his conspiracy convictions are multiplicitous in violation of the Double Jeopardy Clause. See Reply at 50-51. To the extent this is the case, the Petitioner cannot do so given he has not filed a motion to amend and the time to amend his pleading "as a matter of course" has expired. See Fed. R. Civ. P. 15(a)(1)-(2). Moreover, the Petitioner is confused when he argues the government was required to prove the start and stop of each conspiracy. Reply at 50. In the context of successive conspiracy prosecutions, the Double Jeopardy Clause may bar a second conspiracy prosecution, if the second conspiracy cannot be shown to be distinct from the first. United States v. Jones, 858 F.3d 221, 223-24 (4th Cir. 2017). To determine if one conspiracy is distinct from another in that context, courts look to the characteristics of the conspiracy, including timing, individuals involved, and nature and scope of the conspiracies. See id. at 225. However, there are no successive prosecutions here, only the one. Furthermore, to the extent the Petitioner argues he was punished multiple times for the same conspiracy offense, Reply at 50-51, he is wrong. Here, there were three different conspiracies, Hostage Taking

enter into an agreement with the other pirates, and even were an "agreement . . . suspected," he could not be convicted of the conspiracy counts as he was acting under duress. Id. at 54-56. The United States asserts that this claim is in procedural default, and it is. Resp. at 18. As cause excusing default, the Petitioner advances three ineffective assistance claims, each of which is insufficient to excuse his default.

First, to excuse his default, the Petitioner argues his trial attorneys rendered ineffective assistance based on their failure to identify and correct the alleged interpreter problem. Mem. Supp. at 50, 56. This claim has already been determined to be insufficient to excuse procedural default.[18]

Second, as cause excusing default, the Petitioner argues ineffective assistance based on his trial attorneys' alleged

---

Conspiracy, Kidnapping Conspiracy, and Violence Conspiracy, each involving different elements of proof. See Trial Tr. 3037:22-3038:21, ECF No. 924 (jury instructions as to Hostage Taking Conspiracy); id. 3049:8-3050:6 (jury instructions as to Kidnapping Conspiracy); id. 3056:2-3057:4 (jury instructions as to Violence Conspiracy). Finally, the Petitioner's claim, mentioned for the first time here, is procedurally defaulted, and he has not satisfied the test for excusing default. See, e.g., Mikalajunas, 186 F.3d at 492-93 (petitioner must show "cause and actual prejudice" or "a miscarriage of justice" to excuse procedural default).

[18] See supra Part III.A.

conflict of interest. Mem. Supp. at 50, 56.[19] Specifically, the Petitioner alleges his counsel "took action on one client, but refused to argue the correct issue on Beyle," those issues being "the issue of the Interpreter, and the issues of Conflict, as well as the issue, of Actual Innocence, despite the evidence showing demin[im]us involvement." Id. at 19. The Petitioner alleges that his counsel "did not take the same action, because the allegations would have made a[n] adverse effect on the other client he was representing." Id. The Petitioner is wrong and apparently confused here. Although this court did hold a single trial to hear the government's case against the Petitioner and his co-defendants, Salad and Abrar, the Petitioner at all times had his own court-appointed counsel, separate and apart from any other co-defendant. See ECF No. 60 (initial appointment order for Lawrence H. Woodward as counsel for the Petitioner); ECF Nos. 263, 264 (appointment orders for Woodward and Jason Dunn as counsel for the Petitioner, after the filing of the superseding indictment charging death-eligible offenses). Thus, there was no conflict of interest as the Petitioner's attorneys represented him, and only him, throughout the pre-trial, trial, and sentencing proceedings. The Petitioner's allegations have no basis in fact and fail to show his trial attorneys rendered

---

[19] The court also addresses this claim as a freestanding ineffective assistance claim, Ground Eight. See infra Part III.G.

deficient performance under Strickland. This claim of ineffective assistance of counsel cannot excuse the Petitioner's procedural default on Ground Four.

Third, as cause excusing default, the Petitioner asserts that his appellate counsel was ineffective for not raising Ground Four on direct appeal. Mem. Supp. at 48. Evaluating the sufficiency of the evidence claim on the merits, it is apparent the Petitioner cannot meet his burden under Strickland and Smith to demonstrate ineffective assistance of appellate counsel.

During his initial interviews with the FBI, the Petitioner confirmed his voluntary participation in the Quest piracy. See FBI Interview Summaries; Trial Tr. 1703-04; id. 1711:10-14; id. 1720:10-20. Corroborating those statements, the government produced numerous witnesses during trial who testified to the Petitioner's voluntary and knowing participation in the Quest piracy, including his contribution of the boat motor to the mission, his being a member of the pirate boarding party that approached and seized the Quest, and his firing of a gun in the air as that boarding party approached. E.g., Trial Tr. 905:17-907:25; id. 923:16-924:15; id. 939:6-8; id. 1084:11-1085:16, ECF No. 914; id. 1088:1-8; id. 1097:1-17; id. 1109:16-22; id. 1560:21-24, ECF No. 916; id. 1564:15-1565:21; id. 1566:1-12; id. 1908:20-1909:03; id. 2563:16-21, ECF No. 920; id. 2603:16-2604:10. Additionally, some of these witnesses

testified to the Petitioner's being among the subgroup of pirates that threatened to kill the American hostages. E.g., id. 1120:9-25; id. 1567:20-24. Witnesses also testified to actually seeing the Petitioner point his gun at the hostages on the day they were killed, right before the shooting started. E.g., id. 1124:22-1125:23; id. 1572:17-22. Finally, witnesses also testified to the Petitioner actually shooting at the hostages. E.g., id. 1128:3-9; id. 1128:19-21; id. 1575:18-22.

The Petitioner now claims he was kidnapped by the pirates and forced to participate in the Quest piracy. Yet, the logical point for him to first reveal that information would have been during his initial interviews with the FBI, which are tellingly bereft of any such claim. Moreover, none of the testifying witnesses, who were his co-conspirators already convicted of being involved in the conspiracy, ever stated that the Petitioner was there unwillingly. Additionally, the Petitioner's claims regarding his acting under duress are contradictory to his assertions that the pirates were going to pay him back for the motor he contributed to the piracy mission. Compare Mem. Supp. at 26-27, and Reply at 31, with Mem. Supp. at 52, 54, 71. The Petitioner further states he never held a gun. Reply at 29, 73. However, he also explains he only held a gun when forced to do so, and he only fired a gun when forced to do so. Id. at 72. These contradictions undermine his claim of duress, coupled with

the fact that the Petitioner presents no facts supporting this claim beyond his own allegations. These assertions are insufficient to support a claim of duress contrary to the overwhelming evidence in the case of the Petitioner's voluntary participation in the conspiracies, which the jury found beyond a reasonable doubt.

As there was no indication of duress, the Petitioner's sufficiency of the evidence challenge to the conspiracy convictions lacks merit. Accordingly, the Petitioner cannot demonstrate a reasonable probability that, but for appellate counsel's failure to raise the issue, he would have won his appeal. Because he cannot meet his burden under Strickland and Smith, this claim cannot excuse his procedural default on Ground Four.

In summation, the court concludes that none of the Petitioner's three ineffective assistance claims can excuse his procedural default on Ground Four. Accordingly, the default remains unexcused and Ground Four is **DISMISSED**. Additionally, regardless of default, Ground Four is without merit.

### D. Ground Five

As Ground Five, the Petitioner argues that his Fifth and Sixth Amendment rights were violated by the trial court's refusal to allow him to call a witness. Mem. Supp. at 58-59; Reply at 52. In particular, the Petitioner claims he wished to

call his employer, "who operated a business in Yemen." Mem. Supp. at 59, 61; Reply at 53. The government states that this compulsory process claim is in procedural default, and it is. Resp. at 19. As cause excusing default, the Petitioner presents two claims of ineffective assistance of counsel. First, to excuse default, he again argues his trial attorneys rendered ineffective assistance based on their failure to identify and correct the alleged interpreter problem. Mem. Supp. at 64; Reply at 63. This claim has already been determined to be insufficient to excuse procedural default.[20]

Second, to excuse default, the Petitioner asserts that his appellate counsel was ineffective for not raising Ground Five on direct appeal. Mem. Supp. at 63. Evaluating the compulsory process claim on the merits, it is evident the Petitioner cannot meet his burden under Strickland and Smith to demonstrate ineffective assistance of appellate counsel. The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have compulsory process for obtaining witnesses in his favor." U.S. Const. amend. VI. This right is "circumscribed, however, by the ability of the district court to obtain the presence of a witness through service of process," and the "well established and undisputed principle that the process power of the district court does not extend to

---

[20] See supra Part III.A.

35

foreign nationals abroad." United States v. Moussaoui, 365 F.3d 292, 300 (4th Cir. 2004).

Here, in the first instance, the Petitioner points to nothing in the record indicating he asked for and was denied compulsory process, or a related motion, on the basis of his inability to call his Yemeni employer. Although the court ruled on a motion to dismiss the indictment for inability to investigate and corroborate a duress defense that raised a nearly identical issue of calling foreign nationals as witnesses, that motion to dismiss was presented by the Petitioner's co-defendant Abrar. See ECF Nos. 507, 537. Additionally, the Petitioner's Yemeni employer is a foreign national. See Mem. Supp. at 62 (suggesting that the United States needed to "elicit[] the assistance of the United States Embassy in Yemen" to find his employer). Accordingly, the Yemeni employer lay beyond the subpoena powers of the district court, and any inability of the Petitioner to call his employer as a witness does not render his conviction unconstitutional. See Beyle, 782 F.3d at 170-71; United States v. Zabaneh, 837 F.2d 1249, 1259-60 (5th Cir. 1988) ("It is well established . . . that convictions are not unconstitutional under the Sixth Amendment even though the United States courts lack power to subpoena witnesses, (other than American citizens) from foreign countries.").

As a final note, even if the court had directed individuals to make an effort to locate and serve subpoenas on the Petitioner's Yemeni employer, it is unclear whether such efforts would have been successful as the Petitioner does not name his employer once, raising the question whether such an employer even exists. In his Reply, the Petitioner states for the first time that he has family members living in the United States and Canada, and offers that these family members can offer additional support on his claims regarding his Yemeni employer, his alleged interpreter problem, and his duress defense for the purposes of this Motion. Reply at 53, 60.[21] However, the Petitioner again fails to provide the names or locations of these family members, instead offering that they are "to be sufficiently identified . . . when the Court permits the Expansion of Hearing." Id. at 60.[22] In light of the fact that the Petitioner had no trouble putting his defense team in touch with his family members in Somalia, even providing them with phone

---

[21] The Petitioner again appears to be attempting to use his Reply to add a new claim that he wished to call these family members during his trial and was prevented from doing so. Reply at 57. To the extent this is the case, the Petitioner cannot do so given he has not filed a motion to amend and the time to amend his pleading "as a matter of course" has expired. See Fed. R. Civ. P. 15(a)(1)-(2).

[22] Presumably the Petitioner is referring here to an evidentiary hearing.

37

numbers for his family,[23] it is difficult to imagine why the Petitioner cannot even name his employer or these family members now—especially when one of the supposed relatives in the United States is his "Blood Sister." Reply at 53. This casts significant doubt on the existence of both the employer and the family members.

For all these reasons, the compulsory process claim lacks merit. Thus, the Petitioner cannot demonstrate a reasonable probability that, but for appellate counsel's failure to raise Ground Five, he would have won his appeal. Accordingly, his procedural default on Ground Five is unexcused, and Ground Five is **DISMISSED**. Additionally, regardless of default, Ground Five is without merit.

### E. Ground Six

As Ground Six, the Petitioner argues that his Fifth and Sixth Amendment rights were violated by the court's "systematic[] exclus[sion]" of Somali citizens and Muslims from the jury pool. Mem. Supp. at 65; Reply at 65.[24] The United States asserts that this claim is procedurally defaulted, and it is.

_____

[23] See supra Part III.A.

[24] The Petitioner again attempts to use his Reply to add a new claim, asserting for the first time that "the [g]overnment's reasons for striking a black juror were pretext for purposeful race discrimination." Reply at 65. As the Petitioner never filed a motion to amend his Motion, and the time to amend "as a matter of course" has expired, see Fed. R. Civ. P. 15(a)(1)-(2), the court declines to consider this claim.

Resp. at 22. As cause excusing default, the Petitioner asserts two claims of ineffective assistance of counsel. First, to excuse default, he again argues his trial attorneys rendered ineffective assistance based on their failure to identify and correct the alleged interpreter problem. Reply at 66. This claim has already been determined to be insufficient to excuse procedural default.[25]

Second, to excuse default, the Petitioner argues his trial counsel was ineffective for not raising the alleged systematic exclusion of Muslims and United States citizens of Somali origin. Mem. Supp. at 68; Reply at 66. Here, the Petitioner's trial counsel filed a motion "to expand the jury pool beyond voter registration lists to ensure a fair and cross-representative section of the community." ECF No. 496. That motion alleged the systematic exclusion of African Americans, and was denied by the court for failure to demonstrate that affirmative discrimination affects the jury selection process. United States v. Salad, No. 2:11cr34, 2012 WL 12953820, at *2 (E.D. Va. Nov. 21, 2012). In light of the court's decision on this motion, any failure of trial counsel to file a similar motion based on the alleged systematic exclusion of Muslims and United States citizens of Somali origin was a reasonable strategic decision based on their "sound evaluation

_____
[25] See supra Part III.A.

of . . . likelihood of success." United States v. Daniel, 3 F.3d 775, 779 (4th Cir. 1993). For that reason, the Petitioner cannot demonstrate that his trial counsel's conduct was deficient under Strickland.

Additionally, the Petitioner cannot demonstrate prejudice. In his Motion, the Petitioner does not explain how these groups were systematically excluded; just simply that they were. Mem. Supp. at 66-67; Reply at 67. Mere allegations are insufficient to make out a prima facie violation of the fair cross section requirement. See Duren v. Missouri, 439 U.S. 357, 364 (1979) (setting forth the requirements for establishing a prima facie violation of the fair cross section requirement). The Petitioner does not allege that the court's jury plan or jury selection process was defective or that there was a violation thereof. See Runyon, 228 F. Supp. 3d 569 at 650-52 (addressing such allegations and finding them without merit). He also does not make any showing of the exclusion of these groups from the jury pool or the availability thereof for the jury pool. Moreover, he does not allege there was improper venue on this ground.[26]

---

[26] The Petitioner's trial attorneys did file a motion to change venue. See ECF No. 494. However, that motion argued a venue change was necessary on the basis that the large presence of the United States Navy in the Norfolk Division prevented the court from empaneling an unbiased jury and that the pretrial publicity had tainted the jury pool. Id. at 2-3. The court denied the motion. United States v. Salad, 915 F. Supp. 2d 755, 760 (E.D. Va. 2012).

Because the Petitioner's ineffective assistance claim fails both of Strickland's prongs, it is insufficient to overcome the Petitioner's default on Ground Six. Consequently, Ground Six is **DISMISSED**. Additionally, regardless of default, Ground Six is without merit.

### F. Ground Seven

As Ground Seven, the Petitioner argues that there was insufficient jurisdiction and evidence to convict him of the firearms charges (Counts Twenty-One through Twenty-Six). Mem. Supp. at 69, 72, 75; Reply at 72-73. The government asserts this claim is procedurally defaulted, and it is. Resp. at 23. As cause excusing default, the Petitioner asserts three ineffective assistance claims.

First, to excuse default, he argues that his counsel "was ineffective in abandonment of his client and refusing for prejudice reasons, to represent his client." Mem. Supp. at 72. This ineffective assistance claim is plainly without merit. The Petitioner's trial counsel represented him through the guilt, eligibility, and penalty phases of the month-long capital trial, not to mention the two preceding years, during which counsel undertook significant investigative and legal research to build the Petitioner's defense, as well as the months after the trial leading up to and through the sentencing. Moreover, one of the Petitioner's trial counsel, Lawrence Woodward, was also his

41

appellate counsel and filed a merits brief with the Fourth Circuit. At no point did the Petitioner's counsel "abandon" him and he offers no support for his claim that his representation was tainted by prejudice of any kind. The Petitioner's allegation of abandonment and prejudice, without more, is insufficient to meet the Strickland standard.

As his second and third claims to excuse default, the Petitioner argues that his trial attorneys rendered ineffective assistance by not raising these jurisdictional and sufficiency of the evidence challenges to the firearms charges. See Mem. Supp. at 75. The court addresses the alleged ineffective assistance with respect to the jurisdictional challenge first, and the sufficiency of the evidence challenge second.

1.

The Petitioner appears to fault his trial attorneys for failing to make two attacks on the court's jurisdiction with respect to the firearms charges. The Petitioner first seems to argue that his trial attorneys should have challenged the jurisdiction of the firearms charges on the basis that he could not be convicted of some of the underlying crimes because those crimes were multiplicitous. See Mem. Supp. at 69, 75. The firearms charges are all violations of 18 U.S.C. § 924(c). See Superseding Indictment at 25-30. Section 924(c) punishes

> any person who, <u>during</u> and <u>in</u> <u>relation to</u> <u>any</u> <u>crime of</u>
> <u>violence</u> or drug trafficking crime (including a crime
> of violence or drug trafficking crime that provides
> for an enhanced punishment if committed by the use of
> a deadly or dangerous weapon or device) <u>for</u> <u>which</u> <u>the</u>
> <u>person</u> <u>may</u> <u>be</u> <u>prosecuted</u> in a court of the United
> States, uses or carries a firearm, or who, in
> furtherance of any such crime, possesses a firearm[.]

18 U.S.C. § 924(c)(1)(A). The Superseding Indictment sufficiently alleged that the conduct underlying the firearms charges occurred "during and in relation to the commission of a crime of violence for which [the Petitioner] may be prosecuted in a court of the United States." See Superseding Indictment at 25-30. Although the Petitioner could not be <u>convicted</u> of all the charges for which he was prosecuted, he certainly could be <u>prosecuted</u> for all these charges in a United States court, and that is all § 924(c) requires. See <u>Ragins</u>, 840 F.2d at 1187 (stating the Double Jeopardy Clause "provides protections against the imposition of cumulative <u>punishments</u> for the same offense in a single criminal trial" (emphasis added)); <u>see</u> <u>also</u> <u>Salad</u>, 907 F. Supp. 2d at 750 (denying motion to dismiss certain counts as being multiplicitous on basis that motion was premature and should be heard after the jury rendered its verdict on the counts). Because the court had jurisdiction with respect to the firearms charges, any failure of the Petitioner's trial attorneys to claim otherwise was not deficient conduct or prejudicial to the Petitioner. Accordingly, this claim of

43

ineffective assistance is insufficient to excuse his default on Ground Seven.

The Petitioner next seems to fault his attorneys for failing to challenge the court's jurisdiction for the crimes underlying the firearms charges in Count Twenty-One and Count Twenty-Six, contradictorily claiming that he was in Somali territory at the time he fired a gun and also that he was in international waters.[27] See Mem. Supp. at 72, 75; Reply at 72. Because the court clearly had jurisdiction with respect to all of the crimes underlying Counts Twenty-One and Twenty-Six, any failure of the Petitioner's trial attorneys to claim otherwise was not deficient conduct or prejudicial to the Petitioner.

The underlying crimes for Counts Twenty-One and Twenty-Six are Counts One through Twenty. See Superseding Indictment at 25, 30. Counts Six through Ten and Sixteen through Twenty all required the government to prove that the Petitioner was within the special maritime and territorial jurisdiction of the United

---

[27] A petitioner is generally not permitted to relitigate issues brought on direct appeal in a collateral attack. Boeckenhaupt v. United States, 537 F.2d 1182, 1183 (4th Cir. 1976) (per curiam). Although exceptional circumstances may grant relief from this rule, see Davis v. United States, 417 U.S. 333, 342-47 (1974) (permitting § 2255 petitioners to relitigate claims after an intervening change in law), none are present here. Accordingly, to the extent the Petitioner attempts to relitigate the claim argued on direct appeal, that the court lacked jurisdiction with respect to Counts Twenty-Two through Twenty-Five because the underlying actions occurred within Somalia's territorial waters and not on the high seas, he cannot. See Beyle, 782 F.3d at 167 (rejecting this challenge).

44

States and/or on the high seas. See id. at 10-14, 20-24. The outer territorial limit of a nation's seas is twelve nautical miles. R.M.S. Titanic, Inc. v. Haver, 171 F.3d 943, 965 (4th Cir. 1999). At the time the armed pirates attacked the Quest on February 18, 2011, the conduct underlying Count Twenty-One, the Quest was about 960 miles from the Somali coast. Trial Tr. 1909:7-17; see Superseding Indictment at 25 (charging § 924(c) violation on February 18, 2011). On February 22, 2011, when another pirate on the Quest fired a rocket-propelled grenade at a United States Navy ship, the conduct underlying Count Twenty-Six, the Quest was still not in Somalia's territorial waters. Trial Tr. 622:17-20, ECF No. 911; see Superseding Indictment at 30 (charging § 924(c) violation on February 22, 2011 and stating that the "firearm was a destructive device, specifically a rocket propelled grenade"); see also Beyle, 782 F.3d at 167 (rejecting the Petitioner's jurisdictional challenge to the charges of murder and concomitant use of a firearm and determining that, on February 22, 2011, the pirates were still on the high seas and not in Somalia's territorial waters). Accordingly, the court had jurisdiction with respect to Counts Six through Ten and Sixteen through Twenty.

The court also had jurisdiction with respect to Counts One through Five, as the pirates seized and detained four United

45

States citizens. Trial Tr. 2211:1-4, ECF No. 919; see Superseding Indictment at 3-9. Finally, the court had jurisdiction with respect to Counts Eleven through Fifteen as well, because (1) the Quest was a "covered ship" as that term is defined in 18 U.S.C. § 2280(d)(5), Trial. Tr. 2661:15-21; and (2) during the Quest piracy, United States citizens were seized, threatened, injured or killed, id. 2211:1-4; id. 1201:03-1205:1.

Accordingly, the Petitioner's trial attorneys did not render ineffective assistance by failing to challenge the court's jurisdiction for any of the crimes underlying the firearms charges in Count Twenty-One and County Twenty-Six, and the Petitioner's procedural default on Ground Seven remains unexcused.

**2.**

The Petitioner also appears to fault his trial attorneys for failing to raise a sufficiency of the evidence challenge to the firearms charges. Mem. Supp. at 75. In support of this claim, the Petitioner asserts the following: he acted in duress, Mem. Supp. at 70, Reply at 71; he was not a member of the conspiracy, Reply at 73; he never held a gun, id.; that he only held a gun when forced to do so, id. at 72, 76; that he only fired a gun when forced to do so, id. at 76; and that the gun was fired only in the air and thus was not a crime, id. at 72. The court has previously addressed the Petitioner's claim that

46

there was insufficient evidence of his agreement to the conspiracy, as well as his claim of duress. In both respects, the court found the Petitioner's claims without merit.[28] Additionally, the Petitioner's contradictory assertions that he did or did not hold a gun, when, and why, are insufficient to demonstrate that his trial attorneys rendered ineffective assistance for failing to challenge the sufficiency of the evidence supporting the firearms charges. The government demonstrated the following at trial:

- The Petitioner carried and fired a gun in the air when he and a few of the other pirates advanced towards the Quest in a small boat, on February 18, 2011. Trial Tr. 1565:9-18.

- There was a rocket-propelled grenade launcher in the small boat at the time they approached the Quest. Id. 1565:7-8.

- The Petitioner was a member of the subgroup of pirates that threatened to kill the hostages. Id. 1120:9-25; id. 1567:20-24.

- The Petitioner was seen pointing his gun at the hostages on the day they were killed, February 22, 2011, right before the shooting started. Id. 1124:22-1125:23; id. 1572:17-22.

- Another pirate fired the rocket-propelled grenade at a Navy ship. Id. 1575:9-15; id. 739:23-740:5, ECF No. 912.

- The Petitioner was seen shooting the hostages. Id. 1128:3-9; id. 1128:19-21; id. 1575:18-22.

- The shooting of the hostages involved automatic weapons. Id. 740:21-741:7; id. 1128:24-1129:4.

---

[28] See supra Part III.C.

In light of this evidence, the Petitioner cannot demonstrate that his trial attorneys provided ineffective assistance for failing to raise a sufficiency of the evidence challenge to the firearms charges under Strickland. There was overwhelming evidence upon which to convict the Petitioner on the firearms charges, and any failure to claim otherwise by his trial attorneys was not deficient conduct, but rather a strategic choice based on their "sound evaluation of . . . likelihood of success." Daniel, 3 F.3d at 779. The alleged failure was also not prejudicial to the Petitioner given any such challenge would have been rejected in light of the foregoing evidence. As the Petitioner has failed to meet Strickland's burden to show ineffective assistance, his procedural default on Ground Seven remains unexcused.

In summation, because the Petitioner cannot establish ineffective assistance as cause for excusing his procedural default on Ground Seven, Ground Seven remains in default and is **DISMISSED**. Nonetheless, regardless of default, Ground Seven is without merit.

### G. Ground Eight

As a freestanding ineffective assistance claim, the Petitioner asserts that his counsel was ineffective for operating under a conflict of interest. Mem. Supp. at 19. The court previously addressed this claim when it was presented as

48

cause excusing default on another ground, and found it insufficient under the _Strickland_ standard.[29] For those same reasons, the court **DENIES** it here.

## H. Ground Nine

The Petitioner also argues that his counsel was ineffective for failing to present a duress defense. Mem. Supp. at 24; Reply at 37. The court has previously considered the Petitioner's assertions of duress, and found them wanting, especially when considered against the evidence supporting the Petitioner's voluntary participation in the _Quest_ piracy and the murder of four Americans.[30] Accordingly, any failure of the Petitioner's trial attorneys to present a duress defense was not deficient conduct nor prejudicial to the Petitioner, and Ground Nine is **DENIED**.

## G. "Miscarriage of Justice"

To the extent the Petitioner claims he is actually innocent of the charges, and for that reason, his procedural default on any of the above claims should be excused, such claim is meritless. See Mem. Supp. at 15-16; Reply at 56. The Petitioner does not contest that he was on the _Quest_, only that he was there under duress. However, as stated before, his allegations

---

[29] See _supra_ Part III.C.

[30] See _supra_ Part III.C.

of duress are without merit.[31] Accordingly, his claim that his actual innocence of the charges should excuse his procedural default on his claims for § 2255 relief is **DENIED**.

## IV.

For the reasons above, the court **DISMISSES IN PART** and **DENIES IN PART** the Petitioner's Motion. In particular, the court **DENIES** Grounds Two, Three, Eight, and Nine, as well as the Petitioner's claim of actual innocence. The court **DISMISSES** Grounds One, Four, Five, Six, and Seven as procedurally defaulted. Because the record conclusively resolves the Motion, the Petitioner's requests for an evidentiary hearing, discovery, and appointments of an attorney and interpreter are **DENIED**.[32]

The Petitioner is **ADVISED** that he may appeal from this Opinion and final order by filing, within sixty (60) days of the date of entry of this Opinion, a written notice of appeal to the Clerk of the United States District Court, 600 Granby Street, Norfolk, Virginia, 23510. For the reasons stated herein, the court declines to issue a certificate of appealability.

The Clerk is **DIRECTED** to forward a copy of this Opinion to the Petitioner, to the United States Attorney at Norfolk, and to the Petitioner's trial and appellate counsel.

---

[31] See supra Part III.C.

[32] See R. Governing § 2255 Proceedings for the U.S. Dist. Cts. 6, 8; Memorandum Order of March 24, 2017, ECF No. 1005.

**IT IS SO ORDERED.**

/s/
Rebecca Beach Smith
Chief Judge

REBECCA BEACH SMITH
CHIEF JUDGE

September 1, 2017

.

51